BARRY J. PORTMAN
Federal Public Defender
MANUEL U. ARAUJO,
Assistant Federal Public Defender
160 West Santa Clara Street, Suite 575
San Jose, CA  95113
Telephone:  (408) 291-7753

Counsel for Defendant CAGUIMBAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 07-00787-JW |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S SENTENCING** |
| v. | ) | **POSITION: MEMORANDUM OF** |
| | ) | **POINTS AND AUTHORITIES; EXHIBITS** |
| CARLOS CAGUIMBAL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

    Defendant, through his counsel, as more fully set forth in the attached Memorandum of Points and Authorities, pursuant to Title 18, United States Code, § 3553(a) and the totality of the circumstances, urges the Court to follow the recommendation of the Probation Officer and impose a five-year period of probation, with the condition that Mr. Caguimbal serve a six-month period of home-detention with electronic monitoring and perform one-hundred hours of community service.

    For the reasons set forth in the memorandum of points and authorities, as well as those set forth in the Probation Report, the defense requests that the court follow the Probation Office's recommended sentence.

Dated:  August 19, 2008

                                                             _____/s/_____
                                                             MANUEL U. ARAUJO
                                                             Assistant Federal Public Defender

**MEMORANDUM OF POINTS AND AUTHORITIES**

1.   <u>Introduction</u>

Before the court is a person, who has pled guilty to two counts of fraudulently issuing postal money orders, and one count of making a false statement. When confronted on September 28, 2006, by Joe Fahey, the outgoing Post Office Manager, and Rick Dato, Manager of Customer Services, Mr. Caguimbal admitted that he stole funds from the post office. He told them that he took the money to pay his mortgage[1]. Shortly thereafter, Mr. Caguimbal agreed to make restitution, lost his job, and lost his pension benefits.

As the Presentence Report reflects, Mr. Caguimbal is extremely remorseful of his actions, he is emotionally racked by his shame and guilt, a man so distraught over his actions and perceived difficulty that at one point he contemplated suicide. [See Exhibit A, pg. 4: Letter of Nerissa Caguimbal]. He is also a man who has suffered a great number of collateral consequences for his actions. He lost his twenty-year career, the respect of his fellow employees, and suffers the guilt of knowing that his actions have inflicted emotional trauma on his children and his wife. Thankfully, Mr. Caguimbal long ago earned the respect of members of the community in which he is well known, and because of his good character they have stood beside him and have been willing to come forward on his behalf. [See Exhibits B through XX.] The attached letters from family and friends all attest to his wonderful human character which has earned him their love and respect. He is a person who has always given of himself and has always been ready and willing to help those in need. These persons see his criminal acts as out of character for him, they view his actions as inconsistent with the man they have known for years.   [See Exhibits A through G.]

The Probation Office is recommending a five-year period of probation, on the condition that he serve six months of home detention with electronic monitoring. Regardless of whether the

---

[1] Memorandum of Interview of Rick Dato, dated October 3, 2006, and prepared by Special Agent Susan M. Baughan.

Defendant Caguimbal's Sentencing Position
No. CR 07-00787-JW                             2

defendant abused a position of trust as defined in the Sentencing Guidelines, the home detention sentence recommended by the Probation Office is appropriate under the factors set forth in Title 18, United States Code, § 3553(a), and the defense urges the court to impose it. The totality of the facts as reflected in the Presentence Report and the attached letters from friends and family, attest to the fact that Mr. Caguimbal, given his lifelong history of respect for the law, outstanding responsibility, and his work in the community, should be given an opportunity to work, to educate himself enabling him to obtain gainful employment, provide for his family, and continue to make restitution.

2.  The Components of a Reasonable Sentence

The Sentencing Guidelines are only one factor that the Court must look to for guidance in formulating a just sentence. All the facts and circumstances should be assessed in determining the appropriate sentence. "The overarching statutory charge for a district court is to impose a sentence sufficient, *but not greater than necessary*" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *(United States v. Carty*, 520 F.3d 984 (9th Cir. 2008.) (Emphasis added); 18 U.S.C. § 3553(a); *See also Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007); Section § 3553(a) (emphasis added)). The district court's duty is to impose the least custody time necessary to achieve § 3553(a)'s purposes. The Guidelines range is subordinate to that duty.

The Sentencing Guidelines are but one of several factors that the court must look to in deciding upon a sentence. They are no longer the presumably correct sentence, no longer must a Guideline sentence be imposed unless the defendant establishes extraordinary circumstances to deviate from the Guideline sentence. *United States v. Booker*, 543 U.S. 220 (2005), directs the sentencing court to impose an appropriate sentence, unencumbered by offense levels, criminal history, or the availability of authorized downward departures. In other words, there is no longer any question that the advisory Guideline range is only one factor among several that this Court is

required to consider in determining what constitutes a reasonable sentence. The Court is free to disagree with Guideline ranges and policy considerations. *See Kimbrough v. United States*, 128 S. Ct. at 570. The district court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007). Moreover, the Ninth Circuit has declined to adopt an appellate presumption of reasonableness for a within-guideline sentence. *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008.)

Nor is the district court required to use a formulaic approach yielding a mathematical justification of non-Guideline sentences. *Gall v. United States*, 128 S.Ct. 586, 596 (2007). Rather, it must exercise "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Rita*, 127 S.Ct. at 2469. In sum, "th[e] mandatory system [embodied in § 3553(b)] is no longer an open choice." *Booker*, 543 U.S. at 263. Instead, the district court's duty is to impose the least amount of time necessary to achieve § 3553(a)'s purposes.

The purpose of sentencing as set forth in 18 U.S.C. § 3553(a), includes the need to consider:

- the nature and circumstances of the offense and the history and characteristics of the defendant;
- to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;
- to afford adequate deterrence to criminal conduct;
- to protect the public from further crimes of the defendant; and
- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
- the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and
- the need to provide restitution.

As will be more fully set forth herein, in this particular case, prison type confinement is not

necessary to promote any of the goals of sentencing codified in Title 18, United States Code, § 3553(a). Home detention for six months and community service is a just sentence.

3. <u>Mr. Caguimbal Should Receive a Five Year Period of Probation on the Condition That He Serve a Six-Month Period of Home Detention, Followed by One Hundred Hours of Community Service</u>.

The Probation Department has recommended that the Court set the applicable adjusted Offense Level 10 [PSR ¶¶ 15 - 23], Criminal History I [PSR ¶ 27]. Without additional adjustments, the guidelines call for a sentence from 6 to 12 months in custody. The Probation Office recommends a five-year term of probation on the condition that Mr. Caguimbal serve six months of home detention, and pay restitution in the amount of $67,833.14. [Sentencing Recommendation, page 1.] It is the defendant's position that regardless of the Court's determination regarding the Sentencing Guideline's abuse-of-trust factor, Mr. Caguimbal is the type of individual who should be placed on probation. Mr. Caguimbal's actions in violation of the law are not in dispute, regardless of the label that is attached to them. As Shakespeare wrote, "a rose by any other name is still a rose." Whether the Court adds two offense level points for abuse of trust, the fact remains that Mr. Caguimbal is a person who does not need to be put in jail for any length of time. The totality of the facts weighed under the Section 3553(a) sentencing factors overwhelmingly favor the probation sentence recommended by the Probation Office.

    a. <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant</u>.

Even though the defense agrees with the justification given by the Probation Office, some facts need repeating. It is clear from the attached letters written in support of Mr. Caguimbal that he is a loving and caring man who has given much of himself to his family, community, and his church. The letter by his wife Nerissa Caguimbal gives a detailed accounting of his life from high school through the present. She writes that through the years, "my sisters, brother, and brothers-in-law, nephews, nieces, and friends all have come to rely on Carlos. He is just a great help to anything asked of him. If he didn't know anything about a certain subject, he would do all the

research for you and help in any way he can. And that is the kind of person he is. Carlos is truly a blessing in our lives."

Mrs. Caguimbal also writes of her husband's relationship with her father, demonstrating the caring nature of her husband. She writes in part,

> "My sisters and I were always puzzled by [her father's ability to recognize her husband when her father did not acknowledge being able to recognize other family members] but then realized that why shouldn't my dad recognize Carlos. Carlos was always there for him and my mother. Carlos was the one who took them both to their doctor appointments and picked up their prescriptions. When something needed fixing or they needed help with anything, they called Carlos and he was always more than willing to help."

[Exhibit A, pg. 5.]

His sister-in-law, Anne Bayhoman, writes,

> "As my parents aged, they brought along many medical problems mainly due to diabetes and hypertension. It was Carlos whom they trusted to take them to the doctor's office. When they were feeling sick or ill, he cared for them any time day or night. When my parents had to stay overnight in the hospital, he would stay with them. My mother has since passed away, but he still takes care of my father when he is ill and needs to see a doctor. My father only trusts Carlos to take care of him medically. He usually won't tell us that he is sick, he only tells Carlos." [Exhibit B.]

His sister-in-law Frances Sacayanan, writes in part,

> [f]rom the beginning since I've known Carlos, he's been the most sincere and unselfish person I've known. He is always helping people with their needs and has a kind and caring nature. Because my parents were most comfortable with him, he would be the one to take my dad and mom to the hospital when they were sick.

When my mother got sick and eventually died of a ovarian cancer, he was the one to stay with her in the hospital. He's still the one I call when my dad gets sick and he takes him to the hospital. [Exhibit F.]

The letters by Michael Batchelor and his wife Christine Batchelor gives further evidence to Mr. Caguimbal's character. [Exhibits C and D.] Mr. Batchelor, who is a police officer for the City of Salinas, has known the defendant for approximately 22 years. He and his wife have participated in numerous gatherings with his family. He considers him a good friend and he considers him to be family. Mr. Batchelor writes in part,

[h]e is a kind, caring and compassionate husband and father of two, Kevin and Shelley. He is a role model for both of his children who he loves very much. Kevin and Shelley would be crushed and the family would suffer without the presence of their father.

Carlos is a devout Christian. The doors to his home are always open for dinner to fellow Christians after church on Sundays. He is choir leader and strongly believes in devotion, team building and fellowship. We attend church on Thursdays and Sundays. He often attends both the morning and evening worship services. I repeatedly observe the dedication and commitment he has to his religion and to those he is leading.

Carlos situation pains me, and even still I do not hesitate to write this letter. I believe he is a productive citizen. When I first learned of his shortcomings, he expressed a strong desire to make up for his poor choices. His head was low and he expressed extreme disgust in his decisions. He apologized for his actions and for having put me in this situation. I do not take this lightly. I know this is completely out of character for Carlos and I am shocked that recent events have led him down this road. He recognizes his choices were wrong and he desires to take

Defendant Caguimbal's Sentencing Position
No. CR 07-00787-JW         7

responsibility for his actions.

[Exhibit C.]

    Mrs. Christine Batchelor writes that she has known Mr. Caguimbal for 25 years. She writes in part,

> [h]e is a very kind, caring and compassionate husband and father of two. He enjoys cooking dinner for family and friends almost every Sunday and his home is always open to welcome us all. . . . I observed firsthand the dedication and commitment he has to his religion and to those he is leading. He does not hesitate to help those in need and always puts others first before himself.
>
> Carlos situation is unfortunate however, I believe him to still be a respectful citizen. I feel the events that led him to his present situation were due to desperation at that time and his actions were completely out of character. He has been cooperative with all authorities involved and has expressed his sincere apologies. He realized his lack of good judgment and I believe he is truly sorry.

[Exhibit D.]

    Ely Aquino in part writes,

> [a]s a young man, Carlos was a hard-worker and highly committed to his education and the military. I believe his excellence in the military will attest to that fact. In addition, he was quite involved with social events and assisting those in need. Through our church we were involved with various community clean-up projects, not only in Salinas where we live, but also in Marina. Carlos and I led several committees where he was instrumental in the success of various church musical programs. Outgoing, and always willing to help someone out, Carlos was popular with people around them.
>
> As a friend, Carlos is a great choice. Carlos is a standup person. He is loyal, honest, considerate and supportive individual who has the ability to see and understand

things from another person's perspective. He is a fun, loving man who enjoys having friends and family over on Sunday afternoon for dinner and socializing.

* * * * *

To tell the truth, I really can't think of anything negative about Carlos's personality. He is a fine, well-balanced person with an abundance of positive qualities. Carlos is a very respectful citizen and a God-fearing man.

I am fully aware of the charges against Carlos. Out of his character and momentarily lapse in judgment, he is regretful and very remorseful.

[Exhibit E.]

Attached to Mrs. Caguimbal's letter, the Court will find a number of certificates of appreciation, of accomplishment, and of service beyond the ordinary. This is a person who has always been about service to others and the community. [See Exhibits A-2 thru A-10; and Exhibits J and K.] His decision to seek training in the nursing field is an indication of his care for others, and is consistent with the observed character of kindness. [Exhibits I, and J.]

What went wrong? How could a man who lived such an exemplary life commit the crimes to which he has pled guilty? While the writer does not pretend to be able to fathom the human mind and/or emotions, it is clear that his actions were a break with his true nature. Mrs. Caguimbal's letter perhaps best puts her husband's actions in perspective. What is clear from her letter is that the financial difficulties faced by Mr. Caguimbal did not result from an extravagant lifestyle nor the uncontrollable desire for material wealth. His family's history of financial difficulties started years before with his prolonged illness and hospitalizations. As a result of this situation they lost their home in 1998. In 1999, they went to live with Frances's, Mrs. Caguimbal's sister. In 2004, when her sister was on the verge of losing her home, she and Mr. Caguimbal agreed to take over the home payments from her sister Frances. That same year, Mr. and Mrs. Caguimbal refinanced the home mortgage and were able to make necessary repairs and improvements. These repairs included removing the mold from the walls, removing water damage in the kitchen and bathrooms, repairing

the buckling wood paneling and replacing the carpet. Given the state of disrepair of the home, these repairs were all necessary. In September 2005, the Caguimbal's refinanced the house again to finish the remodeling that they had started the year before. They were told by the finance company, and they were assured, that they would be getting a second mortgage but that their payment would remain the same. However, this was not true. [Exhibit A, pg. 4.] Over a period of time, Mr. Caguimbal was not able to pay the mortgage, and embarked upon the actions of stealing from the post office to make his mortgage payments. As Exhibit A-1 demonstrates, the house eventually went into foreclosure sale.

The offense was the result of the moral conflict that arose within the person who saw his situation as desperate. Mr. Caguimbal is not attempting to justify his crime. To the detached observer his actions were objectively unreasonable. However, to Mr. Caguimbal's subjective mind, his crime was a means of keeping his family together a while longer – fearing that if he lost the home, his wife would leave him, and believing that once his crime was discovered he would lose his family. In reality it was an insane course of action born and fueled by fear and desperation. Obviously, he has found out what was true all along, he had, and has, a very strong marriage born of years of struggle, supported by mutual love, and reinforced by his many acts of kindness, and generosity.

    b.    <u>The Proposed Sentence Affords Adequate Deterrence to Criminal Conduct, Protect the Public from Further Crimes of the Defendant, Reflects the Seriousness of the Offense, Promotes Respect for the Law and Provides Just Punishment for the Offense</u>.

There is no claim that Mr. Caguimbal poses a danger of committing future crimes, or that there is a need to protect the public against his criminality. There is no basis to conclude that he must be incarcerated to deter him or others from engaging in future criminal conduct. He is a man who by all accounts, is not prone to acts of lawlessness. Aside from not having a criminal record, the persons who have known him for many years attest to his good character and the fact that his criminal actions were out of character. Anyone who knows the emotional and financial

Defendant Caguimbal's Sentencing Position
No. CR 07-00787-JW          10

consequences that Mr. Caguimbal has suffered will not look upon a probationary sentence as an incentive to commit a crime similar to Mr. Caguimbal.

The proposed sentence promotes respect for the law and provides a just punishment for the offense. It is respectfully requested that the Court take into account that Mr. Caguimbal has lost his position of many years with the Postal Service. He lost his pension, he has been making restitution and was doing so even before his indictment. He has suffered shame and humiliation, so much so, that he has had a very difficult time telling some of his family members what he did, and at one time contemplated suicide. A just punishment should not be equated with a mechanistic formula in which one size fits all. Justice above all means fairness, and fairness requires that the sentence take into account the whole of the person, not just the criminal act in which he engaged.

Additionally, a sentence of incarceration will make it extremely difficult for Mr. Caguimbal to make restitution. If he goes to jail for any period of time, he will lose his job. His family's financial situation will only worsen. Even after he is released from custody, he will have a difficult time finding employment because of his felony conviction. His abrupt termination from his employment for a prolonged period will only raise more questions, and make it more difficult for him to find employment, especially given his age, and the current economic downturn in the economy.

The requested sentence is not a significant departure from the Sentencing Guidelines, even if the Court imposes the two-level offense level enhancement for abuse of trust. The recommended sentence is well within an acceptable range of sentencing options, which should be seriously considered in determining a sentence and one in keeping with Section 3553(a)'s directive that "a sentence sufficient, *but not greater than necessary* to comply with a purpose set forth in [Subsection 3553(a)(2)]."

Incarcerating Mr. Caguimbal will have an extraordinary effect on innocent family members. This Court has the discretion to impose a sentence which takes into account the emotional and financial harm that his incarceration will cause to his family. Mr. Caguimbal continues to be a care

1  giver to his father-in-law. [Exhibit A, pg. 5, and Exhibit B]. Incarcerating Mr. Caguimbal will only
2  make caring for his father-in-law more difficult considering that the family and father-in-law have
3  always relied on Mr. Caguimbal to provide care.
4      The Court is aware from the letter by Mrs. Caguimbal and from the Presentence Report
5  [PSR ¶ 34] that Mr. Caguimbal's actions and his motivation for committing the crime, has greatly
6  affected his family. His daughter, blaming herself for the added financial pressures of supporting
7  her while at San Francisco State University, had a nervous breakdown, and his son while continuing
8  to greatly admire his father and to love him, has had to put his dreams on hold until the family
9  overcomes the current crises. [Exhibit A, pg. 5.] Their father's service of a jail sentence, even one
10 of five months in a jail type facility, will only make their pain and economic situation worse –
11 without enhancing the security of the public, or measurably deterring others from engaging in
12 similar conduct.

### CONCLUSION

14     Aside from the mechanistic Guideline formula, there is no significant justification for
15 incarcerating Mr. Caguimbal, it will not protect the public from future dangerousness, it will not
16 teach the defendant a lesson that he has not already learned, it will not promote the repayment of
17 restitution, it will not significantly deter others from committing a similar crime, and it will not
18 advance the purpose of rehabilitation and education. In short, there is nothing to gain by a sentence
19 of incarceration, yet a sentence of incarceration may cause unwarranted suffering. For all the
20 reasons set forth herein, it is respectfully requested that the Court sentence Mr. Caguimbal to a five
21 year term of probation on the condition that he serve 6 months of home detention, pay restitution,
22 and perform 100 hours of community service.
23 Dated: August 19, 2008

Respectfully,

_____/S/_____
Manuel U. Araujo,
Assistant Federal Public Defender

Defendant Caguimbal's Sentencing Position
No. CR 07-00787-JW                    12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26